List of Counsel Appears on
Signature Page

The Honorable Robert S. Lasnik

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
at Seattle

REGENCE BLUESHIELD, a Washington
Corporation, ASURIS NORTHWEST HEALTH,
a Washington Corporation, COMMENCEMENT
BAY LIFE INSURANCE CO., a Washington
Corporation, REGENCE BLUECROSS
BLUESHIELD OF OREGON, an Oregon
Corporation, REGENCE HEALTH
MAINTENANCE OF OREGON, INC., an
Oregon Corporation, REGENCE HMO
OREGON, an Oregon Corporation, REGENCE
LIFE AND HEALTH INSURANCE CO., an
Oregon Corporation, REGENCE BLUESHIELD
OF IDAHO, an Idaho Corporation, THE
REGENCE GROUP DEFINED PENSION
PLAN TRUST, an Oregon Trust, and
HEALTHWISE, an Idaho Corporation,

    *Plaintiffs*,

    v.

BNY MELLON BANK, N.A., a national banking
association,

    *Defendant*.

Case No.  2:09-cv-00618-RSL

DECLARATION OF
MICHAEL W. MCDERMOTT
IN SUPPORT OF
DEFENDANT'S RESPONSE
IN OPPOSITION TO

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW
CAUSE WHY A PRELIMINARY
INJUNCTION SHOULD NOT ISSUE

*[Oral Argument Requested]*

**MICHAEL W. MCDERMOTT** declares:

1.   I am a First Vice President and Manager of Securities Lending Client Service for BNY Mellon Securities Lending.  As Manager of Securities Lending Client Service, I am familiar with the contracts at issue in this dispute and the documents attached to this Declaration.  In addition, I participated in communications with Plaintiffs regarding the topics discussed herein.  Accordingly, I have personal knowledge of the facts reported in this Declaration.  I am over the age of eighteen, am not a party to this action, and am in all other respects fully qualified and competent to testify to the facts stated in this declaration and would so testify if called upon to do so.

2.   I make this declaration in support of Defendant's Response In Opposition To Plaintiffs' Motion For Temporary Restraining Order And Order To Show Cause Why A Preliminary Injunction should Not Issue, filed concurrently herewith.

**I.**
**The Governing Agreements and Relevant Terms**

*A.  Custody Agreements*

3.   BNYM is a leading asset management and securities services company.

4.   With one exception, Plaintiffs are all parties to Amended and Restated Custody Agreements with the Mellon Bank, N.A. ("BNYM").  However, one Plaintiff, The Regence Group Defined Pension Plan Trust, is not a party to an Amended and Restated Custody Agreement.  The proper party is The Regence Group (in its corporate capacity and as named fiduciary of the Regence Group Retirement Plan) which is a party to a Trust Agreement entered into with BNYM on January 1, 1997.  *See* Declaration of Andreas Ellis in Support of Regence's Motion for Injunctive Relief ("Ellis Decl.") Exhibit A-1.

5.      Contrary to Plaintiffs' assertions, the Custody Agreements do not establish BNYM as a fiduciary; in fact, the Custody Agreements state expressly that BNYM is not a fiduciary.

6.      Each of the Custody Agreements contains a provision at section 22, stating:

> **Custodian Non-Fiduciary Status**.    The Client hereby acknowledges and agrees that the Custodian is not a fiduciary by virtue of accepting and carrying out its duties under this Agreement, and has not accepted any fiduciary duties, responsibilities or liabilities.

7.      Plaintiff Commencement Bay Life Insurance Co. entered into an Amended and Restated Custody Agreement with BNYM on December 29, 2005.    *See* Ellis Decl. Exhibit A-2.

8.      Plaintiff Asuris Northwest Health entered into an Amended and Restated Custody Agreement with BNYM on December 29, 2005.  *See* Ellis Decl. Exhibit A-3.

9.      Plaintiff Regence Blueshield entered into an Amended and Restated Custody Agreement with BNYM on December 29, 2005.  *See* Ellis Decl. Exhibit A-4.

10.     Plaintiff Regence Blueshield entered into an Amended and Restated Custody Agreement with BNYM on December 29, 2005.  *See* Ellis Decl. Exhibit A-5.

11.     Plaintiff Healthwise entered into an Amended and Restated Custody Agreement with BNYM on December 29, 2005.  *See* Ellis Decl. Exhibit A-6.

12.     Plaintiff Regence Life and Health Insurance Co. entered into an Amended and Restated Custody Agreement with BNYM on December 29, 2005.  *See* Ellis Decl. Exhibit A-7.

13.     Plaintiff Regence Health Maintenance of Oregon, Inc. entered into an Amended and Restated Custody Agreement with BNYM on December 29, 2005.    *See* Ellis Decl. Exhibit A-8.

14.   Plaintiff Regence HMO Oregon entered into an Amended and Restated Custody Agreement with BNYM on December 29, 2005.  *See* Ellis Decl. Exhibit A-9.

15.   Plaintiff Regence Bluecross Blueshield of Oregon, Inc. entered into an Amended and Restated Custody Agreement with BNYM on December 29, 2005.  *See* Ellis Decl. Exhibit A-10.

**B. Securities Lending Authorization Agreements**

16.   Plaintiffs are participants in an investment program called securities lending. Securities lending is a type of investment program in which investors lend securities they own to third-parties in exchange for collateral, often 102% of the value of the security in cash, and under terms set forth in a detailed contract.  The borrowers of the securities typically use the securities for short-sales; the lenders typically use the collateral to invest. On the termination of the loan, the borrower returns the securities and the lender returns the collateral. BNYM operates an extensive securities lending program.  Attached at Exhibit 1 is a true and correct copy of a chart that BNYM created to provide an introduction to the securities lending program.

17.   Securities lending programs typically are facilitated by an intermediary bank, which can invest the collateral on behalf of the lenders.  In some circumstances, as in the case of Regence, the collateral is used to purchase "units" in collective investment pools (such as DBT II).  DBT II is a collective investment vehicle BNYM uses to invest cash collateral on behalf of securities lending customers, including Plaintiffs, in connection with BNYM's securities lending program.

18.   Through BNYM's securities lending program a bank customer could engage BNYM as its agent to lend securities the bank customer owned to third-parties in exchange for collateral under the terms of a detailed Securities Lending Agreement ("Agreement").

19.   Plaintiff Regence Blueshield entered into an Agreement with BNYM on March 30, 1999.  *See* Ellis Decl. Exhibit B-4.

20.   Plaintiff Regence Blueshield of Idaho entered into an Agreement with BNYM on March 30, 1999.  *See* Ellis Decl. Exhibit B-5.

21.   Plaintiff Regence HMO Oregon entered into an Agreement with BNYM on March 30, 1999.  *See* Ellis Decl. Exhibit B-9.

22.   Plaintiff Regence Bluecross Blueshield of Oregon, Inc. entered into an Agreement with BNYM on March 30, 1999.  *See* Ellis Decl. Exhibit B-10.

23.   Plaintiff Commencement Bay Life Insurance Co. entered into an Agreement with BNYM on September 27, 2006.  *See* Ellis Decl. Exhibit B-2.

24.   Plaintiff Asuris Northwest Health entered into an Agreement with BNYM on September 27, 2006.  *See* Ellis Decl. Exhibit B-3.

25.   Plaintiff Healthwise entered into an Agreement with BNYM on September 27, 2006.  *See* Ellis Decl. Exhibit B-6.

26.   Plaintiff Regence Life and Health Insurance Co. entered into an Agreement with BNYM on September 27, 2006.  *See* Ellis Decl. Exhibit B-7.

27.   Plaintiff Regence Health Maintenance of Oregon, Inc. entered into an Agreement with BNYM on September 27th, 2006.  *See* Ellis Decl. Exhibit B-8.

28.   Plaintiff Regence Group Defined Pension Trust is not a party to an Agreement.  The proper party is The Regence Group which signed an Agreement with BNYM "with respect to The Regence Group Retirement Plan" on November 1, 2006.  *See* Ellis Decl. Exhibit B-1.

### C. Choice of Law

29.   Each of the Securities Lending Agreements contains a choice of law provisions stating,

> Governing Law.   This Agreement shall be construed in accordance with, and the rights of the parties are to be governed by, the laws of the Commonwealth of Pennsylvania, exclusive of its conflict of laws principles, and except insofar as the same are or may be preempted or superseded by applicable Federal law.

### D. Authority of Lending Agent

30.   Several Plaintiffs signed Securities Lending Authorization Agreements on March 30, 1999.  In those agreements, BNYM is the "Lending Agent" and the individual Plaintiff is the "Client."

31.   Section 6 authorizes BNYM, as the Lending Agent, to invest the cash collateral in investment vehicles on behalf of the Client.  Section 6 states:

> Collateral Investment.   The Lending Agent is *hereby authorized to invest and reinvest*, on behalf of the Client, any and all cash Collateral in accordance with the provisions hereof.  *Cash Collateral received by the Lending Agent on Behalf of the Client shall be held and maintained by the Lending Agent in one or more collective investment vehicles created and maintained by the Lending Agent or an Affiliate.  Such collective investment vehicle shall be invested and reinvested in accordance with the investment guidelines established for such collective investment vehicle* a copy of which Guidelines are attached hereto and which may be revised or substituted by the Lending Agent from time to time, as Exhibit B.

(emphases added)

32.   Under the Investment Guidelines attached as "Exhibit B" in the March 30, 1999 Agreements, the clients specifically authorized BNYM to invest cash collateral received in

McDERMOTT DECLARATION ISO DEFENDANT'S OPPOSITION TO
MOTION FOR TRO -- Page 6  (Case No. 2:09-cv-0618-RSL)

the Mellon GSL DBT II Collateral Fund, a Series of the Mellon GSL Reinvestment Trust, a Delaware Statutory Trust for which BNYM serves as Investment Manager ("DBT II"). The DBT II fund is a collective (*i.e.*, pooled or common) investment vehicle (*i.e.*, fund) utilized by BNYM for the investment of cash collateral on behalf of certain securities lending clients which included the Regence Group and all the Plaintiffs signing the Securities Lending Authorization Agreements. *See* Ellis Decl. Exhibit B.

33. Several Plaintiffs signed Securities Lending Authorization Agreements on September 27, 2006. In those agreements, BNYM (as the successor by law to Mellon Bank, N.A.) is the "Lending Agent" and the Regence Entity is the "Client."

34. Section 4 authorizes BNYM, as the Lending Agent, to invest the cash collateral in investment vehicles on behalf of the Client. Section 4 states:

> The Lending Agent is hereby authorized to invest and reinvest, on behalf of the Client, any and all cash Collateral as agreed upon by the Lending Agent and the Client and as set forth in Exhibit B hereto. The assets of any collective investment vehicle used for the investment of the Client's cash Collateral pursuant hereto shall be invested and reinvested in accordance with the investment guidelines established for such collective investment vehicle, a copy of which guidelines are attached hereto as part of Exhibit B (the "Investment Guidelines") which guideline may be revised or substituted from time to time, upon not less than thirty (30) days prior notice to the Client of any such revision or substation of Investment Guidelines.

(emphases added).

### E.  Client Bears the Risk of Losses in Principal

35. The March 30, 1999 Agreements state that the risk of "principal losses" resulting from the investment and reinvestment of cash collateral by BNYM is assumed by, and allocated to, the client. In addition, each agreement provides that, in the event the cash

collateral is insufficient to satisfy the obligation of the client to return the full amount owed

to a borrower, the client is liable for such insufficiency.

36.    In the March 30, 1999 Agreements, Section 6 goes on to state:

> … Notwithstanding any other provision hereof, the *Client acknowledges and agrees that any losses of principal from investing and reinvesting Collateral shall be at the Client's risk and for the Client's account.*  If at any time the Collateral is insufficient to satisfy the obligation to return the full amount owed to the Borrower, the Client shall be solely responsible for such shortfall. In the event the Lending Agent is unable to obtain the Client's share of negative earnings or shortfalls from losses of principal from revenues derived from securities lending activities, the Client hereby agrees to pay such amounts immediately upon receipt of Lending Agent's statement; provided, however, that if such amounts are not paid by the Client, the Lending Agent is hereby authorized to obtain such amounts directly from the Client's account, to the extent permitted by applicable law.

(emphasis added).

37.    The September 27, 2006 Agreements state that the risk of any "losses of principal"

or "principal losses" resulting from the investment and reinvestment of cash collateral by

BNYM is assumed by, and allocated to, the client.  In addition, each agreement provides that,

in the event the cash collateral is insufficient to satisfy the obligation of the client to return

the full amount owed to a borrower, the client is liable for such insufficiency.

38.    Section 8(a)(ii) of the September 27, 2006 Agreements states:

> (ii)     *The Client acknowledges and agrees that any losses of principal from investing and reinvesting cash Collateral or any market decline in the value of any non-cash Collateral including, without limitation, the default or failure of any issuer of any letter of credit Collateral (collectively, "Principal Losses") shall be at the Client's risk* and for the Client's account except to the extent, if any, that any such Principal Losses result from the negligence or willful misconduct of the Lending Agent, or the failure of the Lending Agent to comply with the provisions of this Agreement including the Investment Guidelines.

(emphasis added).

**F.  Client Acknowledged That Redemptions May Result In Losses**

39.    Section 13 of the March 30, 1999 Agreements states that the Client may terminate its Lending Agreement at any time.  However, Section 13 of the Agreement also states that the Client acknowledges that termination may result in losses:

> Amendment and Termination.    This Agreement may not be amended or modified except by written agreement duly executed by or on behalf of the parties hereto.  This Agreement may be terminated at any time at the option of either party upon thirty (30) days prior written notice to the other party.  In the event that this Agreement is terminated, the Lending Agent shall not make any further securities loans on behalf of the Client after it has given or received, as the case may be, notice of such termination and shall promptly take all reasonable actions to terminate all securities loans then outstanding. *In accordance with Section 6 of this Agreement, the client acknowledges that certain events, including but not limited to the Client's termination of participation in the Program, certain changes to the composition of the client's lendable securities, extraordinary changes in applicable interest rates or the bankruptcy or insolvency of any issuer of a security may result in a loss to the Client.*  The obligations and the rights of the client and the Lending Agent under this Agreement with respect to any outstanding loans shall survive and continue despite any termination of this Agreement until fully performed or satisfied.

(emphasis added).

40.    Section 11 of the September 27, 2006 Agreements states that the Client may terminate the Lending Agreement at any time.  However, Section 11 of the Agreement also states that the Client acknowledges that termination may result in losses.

> Amendment and Termination.
>
> (a) The Client may, in its sole and absolute discretion, direct the Lending Agent to terminate any loan of the Fund's securities at any time and for any reason in which event the lending Agent shall, promptly, upon receipt of notice thereof from the client, take all steps necessary to cause the termination of such Loan and the return of the loaned securities to the Fund's account within the standard settlement period for such securities.
>
> (b) This Agreement may not be amended or modified except by written agreement duly executed by or on behalf of the parties hereto.    This

Agreement may be terminated at any time at the option of either party upon thirty (30) days prior written notice to the other party.  In the event that this Agreement is terminated, the Lending Agent shall not make any further securities loans on behalf of the Fund after it has given or received, as the case may be, notice of such termination and shall promptly take all reasonable actions to terminate all securities loans then outstanding.  *The Client acknowledges that certain events, including but not limited to the Client's termination of any loan or loans in accordance with (a) above or the termination of participation in the Program, certain changes to the composition of the fund's lendable securities, extraordinary changes in applicable interest rates or the bankruptcy, insolvency or deteriorating credit condition of any issuer of a security may result in a loss to the Fund.*  The obligations and the rights of the Client, the Fund and the Lending Agent under this Agreement with respect to any outstanding loans shall survive and continue despite any termination of this Agreement until fully performed or satisfied.

(emphasis added).

### G. Declaration of the Trust and Investment Management Agreement

41.    Under the Investment Guidelines in the September 27, 2006 Agreements, the clients specifically authorized BNYM to invest cash collateral received in respect of each Lender's securities loans in the Mellon GSL DBT II Collateral Fund, a Series of the Mellon GSL Reinvestment Trust, a Delaware Statutory Trust for which BNYM serves as Investment Manager ("DBT II").

42.    The DBT II fund is a collective investment vehicle utilized by BNYM for the investment of cash collateral on behalf of certain securities lending clients of BNYM, which included The Regence Group and all of the collective Plaintiffs, except for the Regence Group Defined Pension Plan Trust which did not sign a Securities Lending Authorization Agreement.

43.    The DBT II fund is a Series of the Mellon GSL Reinvestment Trust.  A true and correct copy of the Declaration of the Trust is attached at Exhibit 2.

44.    Section 3.5 of the Declaration of the Trust permits the Trustee to determine at its discretion when redemptions may be made in-kind in whole or in part:

> 3.5(b)  Payment of the redemption price to a Beneficial Owner shall be made by the Trust in cash (except as provided by Section 3.5(c)) or by wire transfer or direct book entry to such account as may be designated in writing by such Beneficial Owner; provided, however, that the Trustee may in its discretion (or, in the event that authority has been delegated to the Investment Manager pursuant to the Investment Management Agreement, then only at the direction of the Investment Manager) delay all or any portion of such payment for not more than seven (7) days if the Trustee or the Investment Manager reasonably determines that such delay is necessary to prevent such redemption from having a material adverse impact on the trust and/or the remaining Beneficial Owners.  In no event shall the Trust, the Trustee, or the Investment Manger be liable to a Beneficial Owner for interest on the proceeds of any redemption. *Notwithstanding any other provision in this Section 3.5 to the contrary, in accordance with Section 4.4 hereof, the Trustee may in its discretion (or, in the event that authority has been delegated to the Investment Manager pursuant to the Investment Management Agreement, then only at the direction of the Investment Manager) suspend the right of Beneficial Owners to require the Trust to redeem Units.*

> 3.5(c)  The Units redeemed shall be canceled as of the Valuation Date on which the redemption occurs.  In the event a Beneficial Owner redeems all of its Units, such Beneficial Owner shall thereupon cease to be a Beneficial Owner in the trust.  *The Trustee shall have sole authority to determine (i) whether and to what extent securities of the Trust are to be sold to pay the cash portion of a redemption and (ii) which securities are to be sold for such purpose, provided, however, that such authority may be delegated to the Investment Manager.  In the case of a redemption that is to be made in-kind in whole or in part, the Trustee shall determine in its discretion (or, in the event that authority has been delegated to the Investment Manager pursuant to the Investment Management Agreement, then only at the direction of the Investment Manager) which securities of the Trust are to be transferred to the Beneficial Owner in satisfaction of the in-kind portion of such redemption.*

(emphases added).

45.    The Declaration of the Trust delegates the exercise of this discretion to BNYM, as Investment Manager pursuant to a related agreement – the Investment Management Agreement.  A true and correct copy is attached at Exhibit 3.

46.   The Investment Manager has full power to restrict certain redemptions pursuant to the Declaration of the trust.  Section 2 states:

> 2(b)   The *Trustee hereby delegates to the Investment Manager, to the fullest extent permitted by the Declaration of Trust, authority to exercise and/or direct the trustee with respect to the exercise of the powers set forth in Section 2.2 of the Declaration of Trust.*

> 2(c)   The trustee hereby delegates to the Investment Manager (i) *authority to direct the Trustee with respect to the combination or division of Units of any Series, as contemplated by Section 3.1(b) of the Declaration of Trust, (ii) authority to determine the consideration to be accepted in connection with the issuance of Units, as contemplated by Section 3.1(b) of the Declaration of Trust, (iii) the sole responsibility of determining whether a person is eligible to be a Beneficial Owner,* as contemplated by, and subject to the limitations in, Section 3.2 of the Declaration of Trust, (iv) *authority to determine the times at which Units may be redeemed, as contemplated by Section 3.5(*a) of the Declaration of Trust, (v) authority to direct the Trustee to delay payment or suspend the right of redemption, as contemplated by Section 3.5(b) of the Declaration of trust, (vi) authority to direct the Trustee to make any payment of other than cash in satisfaction of a redemption of Units, as contemplated by Section 3.5(c) of the Declaration of Trust, and (vii) authority to direct the Trustee with respect to the timing and amounts of the declaration and payment of distributions pursuant to Section 3.9 of the Declaration of Trust.

(emphases added)

## H. The Withdrawal Safeguards Are Permissible Pursuant to the Trust Documents

47.   During the fourth quarter of 2007, due to the deteriorating condition of credit and financial markets and the impact on certain securities held in DBT II and on liquidity in general, the Trustee of DBT II, acting through its delegate BNYM, made the decision to begin restricting cash redemptions from the DBT II to preserve liquidity for ongoing ordinary daily operations.

48.   These restrictions were put into place because significant withdrawals of cash could reduce liquidity in DBT II to unacceptably low levels and force the unnecessary realization of mark-to-market losses which would be borne by the remaining participants.  As the

restrictions were ultimately put in place, and subject to certain *de minimis* exceptions, participants wishing to redeem units in DBT II to facilitate loan recalls/terminations other than ordinary daily activity were told that such redemptions would only be permitted "in-kind."

## II.
## SIGMA

49.   Sigma Finance, Inc., ("Sigma") was a structured investment vehicle ("SIV") which is a managed investment vehicle that holds mainly highly rated securities.   The securities held in many SIV's, including Sigma, typically included highly rated term debt from banks and Aaa/AAA rated asset-backed securities, including mortgage-backed securities.   SIVs have historically provided funding for mortgages, credit cards, student loans and similar credit products.

50.   BNYM's securities lending program purchased Sigma Senior Medium Term Notes for some cash collateral pools and client cash collateral investment accounts.

51.   Sigma Senior Medium Term Notes were rated AAA/A-1+ by S&P from 1995 through December 2007.   This rating was downgraded in March 18, 2008 to AA- and again on September 25, 2008 to A with a multi step downgrade to CCC- on September 30, 2008. Moody's similarly rated Sigma Senior Medium Term Notes Aaa/P-1 from February 1995 until an April 2008 downgrade to A2/P-2.   The Sigma Senior Medium Term Notes were subsequently downgraded to A3 in July and Ca on September 30, 2008.

52.   All Sigma Senior Medium Term Notes purchased for BNY Mellon securities lending pools and accounts were rated AAA at the time purchased, had maximum maturities of 2 years and otherwise complied in all respects with applicable investment guidelines.

53.   Sigma continued to operate through 2007 and into 2008 by utilizing repurchase agreements ("repos") with banks and other lenders to generate necessary funding liquidity. Sigma reported that it had reduced total security holdings by 50% between July 2007 and August 2008 with existing book capital of $3.8 billion remaining. Liquidity was reduced with the portfolio reductions, but remained within compliance.

54.   BNYM's decision to hold to maturity the Sigma Senior Medium Term Notes that it held for its securities lending program was based upon, among other things, an assessment that Sigma capital remained available to cushion Senior Medium Term Note holder losses in the event the only option was for Sigma to finance its debt maturities through asset sales. Collateral margins required by repo lenders were only disclosed in annual audits filed by Sigma, the last being received mid September for the period ended April 30, 2008.

55.   After the bankruptcy filing by Lehman Brothers, Inc., marks on collateral for all investors reached extraordinary new lows. It appears that demands from repo lenders for increased collateral protection ultimately forced Sigma to cease operations.

56.   In late September, one of Sigma's repo lenders reportedly served the company a notice of default. This in turn prompted termination of a repurchase agreement. As a result of this event, the ratings agencies reduced Sigma's ratings. On September 30, 2008, Moody's reduced Sigma's senior debt rating 13 steps to Ca, its second-lowest ranking, from A3. Standard & Poor's lowered its rating 13 levels to CCC- from A. On October 6, 2008, Sigma announced Ernst and Young was officially appointed as Receiver in the UK. Deutsche Bank acts as the Security Trustee.

57.   On October 6, 2008 Ernst and Young was appointed as Receiver and a creditors meeting was expected to be scheduled for the week ending October 17, 2008.

58.   BNYM is committed to maximizing the recovery of all possible value in respect of the Sigma securities held on behalf of its clients.   To that end, BNYM has engaged legal counsel and workout professionals on behalf of clients in connection with Sigma and has communicated directly with Sigma's investment managers and Deutsche Bank, as Security Trustee, requesting that each reveal the timing of the transfer of collateral to repo lenders and asking each to make representations regarding whether and to what extent the Security Trustee or directors of Sigma's investment managers intervened when it became apparent that Senior Note holders would be impacted by level of collateral margins required by repo lenders.

### III.
### Efforts to Stabilize the DBT II Trust

59.   From late 2007 into the summer and fall of 2008, and continuing on to the present, the world's financial markets have experienced an unprecedented financial crisis, including a freeze in the credit markets that had a profound effect on the functioning of securities lending programs – those of BNYM as well as those of all other lending agents.

60.   The credit freeze meant that funds, such as BNYM's DBT II, faced a liquidity crisis if a large number of participants withdrew from the program.   Without a functioning credit market, a significant portion of the assets in lending agents' collateral pools suddenly became illiquid.   In addition, the liquidity of those pools came under further pressure when stock prices plummeted, because lending agents were required to refund collateral to borrowers as borrowed securities declined in value.

61.   BNYM realized it would soon be facing a liquidity crisis if it used the liquid assets in its collateral pool to fund a large number of withdrawals.   When a participant decides to

withdraw from securities lending, the lending agent has to recall all of the securities that a participant has out on loan and return to the borrowers, in cash, the collateral they deposited with the lending agent.

62.   If there were a rush to the exits, and BNYM used the liquid assets in the collateral pool to generate the cash necessary to pay back the withdrawing participants' borrowers, the pool's liquid assets would soon be consumed.  To fund further withdrawals or simply the day-to-day requirements of the lending program, BNYM would have no choice but to sell the remaining illiquid assets at fire sale prices, imposing substantial losses on those participants electing to remain in the program.

63.   Taking a first in line approach to withdrawal from securities lending programs would likely spark a "run" on the collateral pools, which could trigger a liquidity crisis and result in severe losses to the program's remaining participants.  To avoid a run and ensure that all participants in BNYM's program are treated fairly, BNYM – like most, if not all, other lending agents – imposed certain safeguards on requests for immediate withdrawal.

64.   In an effort to stabilize the value of DBT II by insulating it from the adverse effects of certain securities issued by Sigma Finance, Inc. (the "Sigma Securities"), on October 1, 2008 the Sigma Securities were transferred out of the DBT II and into a newly created Mellon GSL Reinvestment Trust II (the "Sigma Liquidating Trust"), another series of the Mellon GSL Reinvestment Trust.

65.   Units of the Sigma Liquidating Trust held by DBT II were then distributed by DBT II to the securities lending cash collateral accounts maintained for each of its clients participating in the DBT II (including the Plaintiffs) equal to each such client's proportionate interest in the DBT II as of the close of business on September 30, 2008.

66.   The Sigma Liquidating Trust (the formal legal name of which is the Mellon GSL Reinvestment Trust II) was created pursuant to a Fifth Amendment to Declaration of Trust ("Fifth Amendment").  A true and correct copy is attached as Exhibit 4.

67.   The Fifth Amendment states:

> The Fund shall be permitted to accept subscriptions only from, and issue Beneficial Interests only to, the other Series of the Trust, which may then transfer such Units to their own Beneficial Owners.  The Fund shall issue Beneficial Interests in exchange for securities or illiquid, difficult-to-value and/or distressed assets (such non-cash consideration, "Contributed Assets").  *The Fund does not intend to permit redemptions of Beneficial Interests in the Fund, and Beneficial Owners shall have no right to require the Fund to redeem their Beneficial Interests.  However, the Fund shall have the right, but not the obligation, to redeem any Beneficial Owner, in part or in whole, in kind or for cash.*

> (emphasis added)

68.   Effective as of the close of business on April 17, 2009, a second bifurcation of assets from DBT II was undertaken by the Trustee (acting through the Investment Manager).  This action was taken in order to create more flexibility for participants in the DBT II by providing participants with more options for and better access to available liquidity, which continued to be burdened by deteriorating credit, liquidity and financial markets.

69.   The second bifurcation of assets from DBT II  was facilitated through the use of another series of the Trust created pursuant to a Sixth Amendment to Declaration of Trust ("Sixth Amendment") establishing  the BNY Mellon SL DBT II Liquidating Fund.  A true and correct copy is attached as Exhibit 5.

70.   The Sixth Amendment states:

> The Fund shall be permitted to accept subscriptions only from, and issue Beneficial Interests only to, the Mellon GSL DBT II Fund Series of the trust, which may then transfer such Units to its own Beneficial Owners.  The Fund shall issue Beneficial Interests in exchange for the securities identified in

paragraph 5 hereof contributed by the Mellon GSL DBT II Fund (such non-cash consideration, the "Contributed Assets"). *Beneficial Owners shall have no right to require the Fund to redeem their Beneficial Interests. However, the Fund shall have the right, but not the obligation, to redeem any Beneficial Owner, in part or in whole, in kind or for cash at the request of any Beneficial Owner or at the direction of the Investment Manager.*

(emphasis added).

71.     The assets of DBT II were divided into "Cash/Overnight Assets" and "Term Assets." The Cash/Overnight Assets included cash and any assets having a maturity of one business day or less. The Term Assets included the remaining assets of DBT II. In a transaction substantially identical to that involving the Sigma Securities in 2008, the Term Assets were transferred in-kind from DBT II to the newly created BNY Mellon SL DBT II Liquidating Fund, a series of the Mellon GSL Reinvestment Trust (the "DBT II Liquidating Fund").

72.     In exchange for the transfer of the Term Assets to the DBT II Liquidating Fund, DBT II received units of the DBT II Liquidating Fund which it distributed to each participant based on each such participant's proportionate interest in DBT II as of the close of business on the April 17, 2009.

73.     Each participant's interest in the DBT II Liquidating Fund was deposited to, and held in, the securities lending cash collateral account maintained for each participant by BNYM. The Cash/Overnight assets remain in DBT II, the units of which continue to be held in the securities lending cash collateral account maintained for each participant by BNYM.

74.     After April 17, 2009, the cash collateral held by BNYM for each of the Plaintiffs consisted of (i) units of the DBT II as prescribed by the Agreement; (ii) units in the Sigma

Liquidating Trust which units were a permissible distribution from the DBT II; and (iii) units in DBT II Liquidating Trust which units were also a permissible distribution from DBT II.

## IV.
## Ongoing Correspondence Concerning Termination Between BNYM and Plaintiffs

75.   The Plaintiffs contacted BNYM on numerous occasions to demand that BNYM recall and return all outstanding loans and permit them to exit the securities lending program without loss to them.

76.   On each occasion, BNYM told the Plaintiffs the redemptions from DBT II and the Sigma Liquidating Trust (and more recently, the DBT II Liquidating Trust) required to facilitate the recall and return of their securities and return of cash collateral to the Borrowers could only be made "in-kind."

77.   On October 1, 2008, Plaintiffs wrote to BNYM requesting that BNYM suspend Plaintiffs' participation in the program and requesting return of its securities.  *See* Ellis Decl. Exhibit C.

78.   On October 6, 2008, BNYM provided a written notice to each of its clients, including Plaintiffs, of the foregoing transactions relating to the Sigma Securities.  A true and correct copy is attached at Exhibit 6.

79.   In response to Plaintiffs' October 1, 2008 letter, BNYM advised Plaintiffs they had the right to terminate participation in the program, but that immediately withdrawing its securities would result in realized losses and less than 100% return on the value of its securities.  *See* Ellis Decl. at ¶ 21.

80.   By their own account, Plaintiffs chose to do nothing at the time.  *See* Ellis Decl. at ¶ 21.

McDERMOTT DECLARATION ISO DEFENDANT'S OPPOSITION TO
MOTION FOR TRO -- Page 19   (Case No. 2:09-cv-0618-RSL)

81. On March 6, 2009, BNYM received letters from Regence on behalf of Asuris Northwest Health and Commencement Bay Life Insurance Company, advising that each requested that lending activity be recalled and reduced to $5,000,000 and $500,000, respectively.

82. BNYM again informed Regence that to facilitate the requested reduction, the contracts and withdrawal safeguards required that they receive a redemption in-kind, that would be sold and that any "principal losses" realized upon such sale would need to be directly funded by Regence. Regence did not respond.

83. During the two week period immediately preceding April 17, 2009, the Plaintiffs were notified by telephone and in writing of the pending bifurcation of the DBT II into separate Overnight and Term funds. A true and correct copy is attached at Exhibit 7.

84. By letter dated April 14, 2009, the Plaintiffs, purporting to act in reliance on the termination provision of their Agreements, notified BNYM of the termination of the Agreements, demanded that further lending cease, and demanded that all outstanding loans be recalled and returned to their accounts. *See* Ellis Decl. Exhibit D.

85. On April 24, 2009, I spoke with Mr. Andreas Ellis of Regence and again informed Plaintiffs that BNYM could comply with their demands, but could do so only by redeeming cash collateral investments in kind, selling the redeemed assets, and requiring each Lender to directly and immediately fund their respective principal losses and/or collateral insufficiency by delivering cash in such amount to BNYM for return to the Borrowers. I promised a detailed written response to their demand.

86. On April 28, 2009, I sent a letter to each Plaintiff, responding to their April 15, 2009 demand letters and explained the required termination process, including the likelihood

termination would cause losses to Plaintiffs.  I described the process as recounted below.  *See* Ellis Decl. Exhibit E.

87.   My April 28 letter invited the Plaintiffs to call BNYM to discuss possible alternatives for mitigating their losses, and indicated that absent immediate notification, BNYM would begin the termination process, but BNYM received no further communication from Plaintiffs until they filed this action in state court.

88.   On May 1, 2009, BNYM again contacted all program participants, including Plaintiffs, by letter explaining changes to the on-going management of the DBT II Fund.  A true and correct copy is attached at Exhibit 8.

## V.
## Process for Redemptions

89.   Plaintiffs had the right to direct termination under their Agreements, but those terminations would result in redemptions from the Sigma Liquidating Trust and the DBT II Liquidating Trust on an in-kind basis.

90.   If Plaintiffs terminated their participation in the program, BNYM, as Lending Agent, would cause all Units of the DBT II Fund, Sigma Liquidating Trust and the DBT II Liquidating Trust held for the account of each Plaintiff to be redeemed by those funds.

91.   Such redemptions from the Sigma Liquidating Trust and the DBT II Liquidating Trust would be made in kind, not for cash.

92.   All securities and other assets representing the proportionate interest of each Plaintiff in each of the investment assets held by the Sigma Liquidating Trust and the DBT II Liquidating Trust would be credited to a separately maintained Collateral Account.

93.   Such in-kind redemptions likely would result in illiquid or otherwise non-tradable lots of one or more securities being credited to a Collateral Account.

94.   Following the in-kind distribution from the Sigma Liquidating Trust and the DBT II Liquidating Trust, the assets distributed would be sold to the extent possible, and all proceeds received from such sales would be held in the Collateral Account or invested until used by BNYM to effectuate the recall or return of outstanding loans of the Plaintiffs' securities.

95.   Alternatively, Plaintiffs could have purchased for cash at par value the investments distributed to them from the DBT II Liquidating Trust, in which case Plaintiffs could have held the investments to maturity in anticipation that they would pay as agreed.

96.   If funds in the Collateral Account were insufficient to effectuate the recall or return of outstanding loans of the Plaintiffs' securities, a principal loss occurs under the Agreement.

97.   In the likely event of a principal loss, BNYM would not permit any loan of Plaintiff's securities to be terminated until the Plaintiff, which bears the risk and burden of such losses under the Agreement, remitted an amount equal to the principal loss to the Collateral Account.

98.   Having thus explained to Plaintiffs the likelihood that termination would result in their suffering losses, I informed them that BNYM would proceed as directed, and would notify them of any principal loss for which they would be responsible under the Agreement.

99.   I invited Plaintiffs to contact BNYM to discuss ways to terminate their lending activity in an orderly fashion and reduce the risk of the immediate and complete realization of principal losses, and asked that they revoke their direction to terminate by calling me immediately.

100. In order to "return all of Plaintiffs' securities in the Program," BNYM would be required to take the following affirmative steps:  (i) sell the Regence's *pro rata* share of the securities in the Sigma Liquidating Fund and the DBT II Liquidating Fund at a loss; (ii) generate or receive from Regence an additional approximately $10.5 million in cash to pay back the collateral to the third-party borrowers; (iii) recall all of Regence's securities from the borrowers; (iv) pay the collateral to the borrowers in order to obtain the securities; and (v) return the securities to Regence.

## VI.
## Economic Injury

101. Under the withdrawal safeguard and contractual provisions, termination of Plaintiffs' participation in the securities lending program, based on market prices as of May 5, 2009 for the relevant securities, would result in Plaintiffs being required to pay approximately $10.5 million to cover the collateral insufficiency.

102. Plaintiffs would suffer no other injury from the operation of BNYM's termination policies.

103. As BNYM prepared to execute the termination of Plaintiffs' participation in the securities lending program, it learned that this lawsuit had been filed, which BNYM took to mean Regence did not wish to exit the program pursuant to the withdrawal safeguards and contractual terms.

104. Accordingly, BNYM has stopped the process of terminating Regence's participation.

I HEREBY CERTIFY AND DECLARE, under penalty of perjury under the laws of the United States and the State of Washington, that the foregoing is, to the best of my

knowledge, true and correct, and that the documents attached hereto are true, complete and correct copies of the originals thereof.

EXECUTED this 11th day of May, 2009, at Pittsburgh, Pennsylvania.

Michael W. McDermott

### Certificate of Service

The undersigned counsel of record for defendant BNY MELLON BANK hereby certifies that on May 11, 2009, a true, complete and correct copy of the foregoing document was electronically filed with the Clerk of the Court through the Court's CM/ECF system, which automatically sends notification of such filing to the persons identified in the system as recipients of electronic notice ; *i.e.*, to:

| | | | |
|---|---|---|---|
| Bradley P. Thoreson | @ | thorb@foster.com<br>boleb@foster.com | and |
| Jeremy Robert Larson | @ | LarsJ@Foster.com<br>Cachl@Foster.com | and |
| Miriam H. Cho | @ | chomi@foster.com<br>cachl@foster.com | and |
| Damien J. Marshall | @ | dmarshall@bsfllp.com<br>crotondo@bsfllp.com | and |
| Kieran P. Ringgenberg | @ | kringgenberg@bsfllp.com<br>sphan@bsfllp.com | and |
| James Kirkham Johns | @ | kjohns@staffordfrey.com<br>nhunt@staffordfrey.com | and |

DATED:  May 11, 2009.

By:   ___/s/ James Kirkham Johns_____

James Kirkham Johns
WSBA No. 12358

McDERMOTT DECLARATION ISO DEFENDANT'S OPPOSITION TO
MOTION FOR TRO -- Page 25   (Case No. 2:09-cv-0618-RSL)